USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1197 ALBERT A. FLIBOTTE, ET AL., Plaintiffs, Appellants, v. PENNSYLVANIA TRUCK LINES, INC., Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy Gertner, U.S. District Judge] ___________________ _________________________ Before Selya and Boudin, Circuit Judges, ______________ and Dowd,* Senior District Judge. _____________________ _________________________ Malcolm J. Barach for appellants. _________________ Regina C. Reardon, with whom Brian P. Crowner and Bray & __________________ _________________ ______ Reardon, P.C. were on brief, for appellee. _____________ _________________________ December 10, 1997 _________________________ _______________ *Of the Northern District of Ohio, sitting by designation. SELYA, Circuit Judge. Having prevailed before a jury, SELYA, Circuit Judge. _____________ plaintiff-appellant Albert A. Flibotte saw his apparent victory turn to ashes when the district court entered judgment as a matter of law in favor of defendant-appellee Pennsylvania Truck Lines, Inc. (PTL) on the ground that Flibotte's claims were preempted by section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. 185 (1994). Flibotte beseeches us to reinstate the jury verdict. We are unable to do so. I. I. __ Background Background __________ Flibotte, a member of Teamsters Local 25, spent almost three decades in PTL's employ. This relationship persisted until PTL terminated him in 1987 for his refusal to participate in a drug testing procedure a refusal that, under the applicable collective bargaining agreement, "constitute[d] a presumption of intoxication." National Master Freight Agreement, Art. 35, Sec. 3 (NMFA). Local 25 filed a grievance on Flibotte's behalf pursuant to the NMFA and eventually took the case to binding arbitration. The arbitrator found that Flibotte's ouster did not violate the collective bargaining pact and rejected the grievance. Flibotte subsequently filed a civil action against PTL in a Massachusetts state court. In addition to a derivative claim for loss of consortium on behalf of Mrs. Flibotte, the complaint contained counts for negligence, invasion of privacy, impairment of civil rights, defamation, negligent infliction of 2 emotional distress, and intentional infliction of emotional distress. Flibotte alleged that PTL notified a group of 37 employees, himself included, to report on March 13, 1987, for the biennial physical examination and drug test required under federal motor carrier safety regulations; that he refused "because his examination was not yet due and because the [designated examination site] was rat-infested"; that, within one week after he boycotted the scheduled test, he took and passed a drug test administered by his own physician; and that PTL nonetheless discharged him summarily on March 18, 1987. He claimed that in so doing, PTL wrongfully terminated his employment and, in the bargain, breached various state-law duties. PTL removed the case to the United States District Court for the District of Massachusetts on dual bases (diversity of citizenship and the existence of a federal question). After the usual preliminaries including the denial of PTL's motion for summary judgment the case proceeded to trial before Judge Nelson and a jury. During the ensuing eight-day trial, PTL twice moved for judgment as a matter of law on the ground of section 301 preemption. Judge Nelson denied one such motion at the end of the plaintiff's case and the other at the close of all the evidence. In due season, the jury returned a verdict for Flibotte on three counts negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress and awarded him $625,000 in damages. 3 Like the mills of the gods, the mills of the judiciary sometimes grind exceedingly slow. On November 20, 1991, PTL made a timely motion for judgment as a matter of law, see Fed. R. Civ. ___ P. 50(b), in which it again hawked section 301 preemption. The motion sat unresolved when, in April of 1992, PTL sought the bankruptcy court's protection under Chapter 11, thus triggering an automatic stay of proceedings in the district court. See 11 ___ U.S.C. 362 (1990). Some seventeen months later, the bankruptcy court confirmed a plan of reorganization. PTL's emergence from the toils of bankruptcy cleared the way for resumption of the district court proceedings. By then, however, Judge Nelson had become disabled and a considerable period of time elapsed before the case was reassigned and a new jurist, Judge Gertner, took up the outstanding motion. She eventually granted it, provoking this appeal. Flibotte's objections possess both procedural and substantive dimensions. First, he argues that Judge Gertner erred when she purposed to revisit issues previously decided by Judge Nelson. Second, he assails the merits of her determination that section 301 preempts his state-law claims. We address each of these objections in turn. II. II. ___ Law of the Case Law of the Case _______________ Flibotte's procedural objection has a chameleonic quality. In one iteration, it implies that Judge Gertner improperly made fact-based determinations contrary to those made 4 by her predecessor and in flagrant disregard of the truism that the judge who actually presides over a trial is in a superior position to make such determinations. Without engaging the myriad counter-precedential assumptions that are essential to this objection, it suffices to say that the legal framework in which motions for judgment as a matter of law exist does not permit courts confronted with such motions to engage in differential factfinding, see Veranda Beach Club Ltd. Partnership ___ ___________________________________ v. Western Sur. Co., 936 F.2d 1364, 1383-84 (1st Cir. 1991) _________________ (discussing applicable standards), and there is no indication here that Judge Gertner disobeyed these guidelines. Flibotte's next iteration of his procedural objection is no more rewarding. He asserts that a court is bound by its own precedents, and that, therefore, Judge Gertner was incompetent to revise Judge Nelson's answers to the legal questions posed by the case. This objection is an apparent effort to employ the venerable law of the case doctrine, which states in the large that, unless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation. See, e.g., United States v. Bell, ___ ____ _____________ ____ 988 F.2d 247, 250 (1st Cir. 1993); Abbadessa v. Moore Bus. Forms, _________ _________________ Inc., 987 F.2d 18, 22 (1st Cir. 1993). ____ This principle is of no real assistance to Flibotte. Although temporally distant from each other, Judge Nelson's denial of PTL's motions for summary judgment and for judgment as 5 a matter of law, on the one hand, and Judge Gertner's decision to grant PTL's post-verdict motion for judgment as a matter of law, on the other hand, occurred in the context of a single trial of a single case in a single court, with no intervening appeal. Judge Nelson and Judge Gertner, therefore, play the same institutional role for the purpose of this litigation. That confluence of judicial identities is dispositive here. "Under the law of the case doctrine, as it is commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." Arizona v. California, 460 U.S. 605, 619 _______ __________ n.8 (1983). Moreover, it is perfectly appropriate for a judge to refuse to direct a verdict, permit the jury to consider a case, and thereafter to grant judgment notwithstanding the verdict. See Talbot-Windsor Corp. v. Miller, 309 F.2d 68, 69 (1st Cir. ___ _____________________ ______ 1962). Accordingly, Judge Nelson would have been free to grant PTL the relief that it sought in its post-verdict motion notwithstanding his previous rulings; and Judge Gertner, who stood in his shoes, was at liberty to do the same. Consequently, Judge Gertner did not arrogate unto herself any undue authority when she entertained PTL's renewed post-verdict motion for judgment as a matter of law and reached a different conclusion than had her co-equal predecessor. III. III. ____ Section 301 Preemption Section 301 Preemption ______________________ Having found no procedural glitch, we turn to Judge 6 Gertner's decision. We review a ruling on a motion for judgment as a matter of law de novo, applying the identical legal standards that constrain the district court. See Colasanto v. ___ _________ Life Ins. Co. of N. Am., 100 F.3d 203, 208 (1st Cir. 1996). _________________________ Accordingly, "the evidence and all reasonable inferences extractable therefrom must be examined in the light most favorable to the nonmovant and a [judgment as a matter of law] should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion." Veranda Beach, 986 F.2d at 1383-84.1 _____________ A. A. __ The Legal Landscape The Legal Landscape ___________________ Read literally, section 301 confers federal court jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." Over the years, however, the  ____________________ 1This case has a peculiar twist. It appears that Judge Gertner, though new to the case, ruled on the motion without the benefit of a trial transcript, and a complete transcript has not been prepared to this date. We need not probe too deeply into the question of which way the absence of this transcript cuts. In most cases, a transcript would form an integral part of the court's decisional calculus on a post-verdict motion for judgment as a matter of law. Here, however, the critical issue  preemption embodies a pure question of law susceptible to resolution on the face of the pleadings (as supplemented by the collective bargaining agreement). In ruling on the motion for judgment as a matter of law, Judge Gertner hewed to this line and did not make any extraneous factual findings or assumptions. Because the judge's analysis and decision did not need to engage any facts derived from trial testimony, this is the rare case in which the absence of a trial transcript is immaterial to the correctness of a ruling on a post-verdict motion for judgment as a matter of law. 7 Supreme Court has placed a heavy gloss on this language, beginning with its holding that the statute empowers federal courts to craft federal common law reasonably necessary to effectuate the objectives of section 301. See Textile Workers v. ___ _______________ Lincoln Mills, 353 U.S. 448, 451 (1957). This substantive ______________ authority to declare federal common law soon formed the basis for an emerging jurisprudence of preemption. See Martin v. Shaw's ___ ______ ______ Supermarkets, Inc., 105 F.3d 40, 41-42 (1st Cir.) (recounting __________________ development of section 301 preemption), cert. denied, 118 S. Ct. _____ ______ 69 (1997). Today, labor-law preemption casts a relatively wide net. Thus, section 301 preempts a state-law claim "if the resolution of [that] claim depends on the meaning of a collective-bargaining agreement." Lingle v. Norge Div. of Magic ______ ___________________ Chef, Inc., 486 U.S. 399, 405-06 (1988). __________ This rule is not without limitations. The Court has cautioned that "purely factual questions about an employee's conduct or an employer's conduct and motives do not require a court to interpret any term of a collective-bargaining agreement." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 262 _______________________ ______ (1994) (citation and internal quotation marks omitted). It also has warned that section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." Livadas v. Bradshaw, 512 U.S. 107, 123 _______ ________ (1994). Even so, the basic test remains that prescribed by Lingle and its progeny: that section 301 preempts a state-law ______ claim, whether founded upon the state's positive or common law, 8 if a court, in passing upon the claim, would be required to interpret the collective bargaining agreement. See id. In ___ ___ practice, this test boils down to whether the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement. A state-law claim can "depend" on the "meaning" of a collective bargaining agreement in two ways. First, a claim so qualifies if it alleges conduct that arguably constitutes a breach of a duty that arises pursuant to a collective bargaining agreement. See United Steelworkers v. Rawson, 495 U.S. 362, 369 ___ ___________________ ______ (1990) ("[A] state-law tort action against an employer may be pre-empted by 301 if the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement."). Second, a claim so qualifies if its resolution arguably hinges upon an interpretation of the collective bargaining agreement. See ___ Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985) (finding ____________________ _____ section 301 preemption "when resolution of a state-law claim is substantially dependent upon analysis of the term of an agreement made between the parties in a labor contract"). If a state-law claim depends on the meaning of the collective bargaining agreement in either of these ways that is, under Rawson's ______ "duty" rubric or under Allis-Chalmers's "interpretation" rubric  ______________ it is preempted. B. B. __ The Merits The Merits __________ 9 At trial, Flibotte prevailed on three state-law claims: negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Our review of the pleadings, supplemented by the items that Flibotte included in the record appendix on appeal (such as the collective bargaining agreement) confirms that none of these three claims involves rights that are made non-negotiable under state law and that all of them are preempted by section 301. For clarity's sake, we begin with the negligence claims and then focus on the intentional infliction claim. 1. Negligence. If Flibotte's two negligence-based 1. Negligence. __________ claims are to escape preemption, he must establish that they do not spring from duties imposed by the collective bargaining agreement, but, rather, that PTL has acted "in a way that might violate the duty of reasonable care owed to every person in society." Rawson, 495 U.S. at 371. This would be no mean feat. ______ Even assuming, favorably to Flibotte, that PTL allegedly breached duties derived from a source extrinsic to the collective bargaining agreement, the resolution of the negligence claims nonetheless depends upon the interpretation of that agreement. Consequently, those claims are preempted under section 301. We explain briefly. Flibotte's damage claim, as framed in his complaint, links both his economic losses and his emotional distress directly to his termination. In order to prevail on these claims, he must prove that PTL wrongfully discharged him. If PTL 10 acted within its contractual rights in severing the tie, then it could not have breached its general duty of care. It is clear to us that we cannot resolve this question, involving the propriety of Flibotte's firing, without substantial inquiry into the intricacies of the collective bargaining agreement. After all, the appellant concedes that PTL cashiered him because he failed to appear for a scheduled drug test, and the collective bargaining agreement in force here the NMFA governs both the frequency of testing, see NMFA Uniform Testing Procedure, Sec. ___ IIB, and the consequences of a failure to take an offered test, see NMFA, Art. 35, Sec. 3. Hence, it is impossible to determine ___ PTL's negligence without inquiring into its rights and obligations as described by the collective bargaining agreement. This mandatory consultation separates the instant case from those that raise purely factual questions and thus begets section 301 preemption. If more were needed and we do not think that it is  we also would note that Flibotte's negligence claims are preempted to the extent that they stem from his contention that the conditions of the requested test were unsanitary and violated the employer's duty to provide a suitable hygienic environment for the examination. This duty derives from the employment relationship as defined in the collective bargaining agreement, and as such, it cannot form the basis for a state-law claim. A plaintiff cannot skirt section 301 preemption by the simple expedient of recharacterizing an employer's substandard 11 performance of duties that devolve upon it pursuant to the terms of the collective bargaining agreement as a tort. See Rawson, ___ ______ 495 U.S. at 371-72. 2. Intentional Infliction of Emotional Distress. This 2. Intentional Infliction of Emotional Distress. ____________________________________________ leaves only the appellant's claim for intentional infliction of emotional distress. To prevail on that claim, Flibotte had to prove that PTL (1) intended to inflict emotional distress by (2) undertaking actions that were extreme and outrageous, thereby (3) causing emotional distress which (4) was severe. See Wagenmann ___ _________ v. Adams, 829 F.2d 196, 213-14 (1st Cir. 1987); Agis v. Howard _____ ____ ______ Johnson Co., 355 N.E.2d 318-19 (Mass. 1976). Under Massachusetts ___________ law, "extreme and outrageous conduct" is behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987). _____ ______________ PTL's rights and obligations under the collective bargaining agreement are obviously central not only to an inquiry into PTL's intentions, but also to an inquiry into whether PTL conducted itself in a sufficiently outrageous manner to give rise to liability under state tort law. It is a well-settled principle that a party cannot be liable if it does no more than "insist upon [its] legal rights in a permissible way, even though [it] was well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts, 46 cmt. g (1965); see Rush v. United Technologies, 930 F.2d 453, 456 (6th ___ ____ ___________________ 12 Cir. 1991). If PTL was within its rights to require Flibotte to take a drug test at the designated site and to terminate him when he refused to do so, a claim for intentional infliction of emotional distress cannot lie.2 Because the resolution of these issues necessitates examination of the collective bargaining agreement, the claim is preempted. See Allis-Chalmers, 471 U.S. ___ ______________ at 213; see also Jackson v. Liquid Carbonic Corp., 863 F.2d 111, ___ ____ _______ _____________________ 119 (1st Cir. 1988) (upholding section 301 preemption in a drug testing case on the ground, inter alia, that "[o]nly by probing _____ ____ the contours of the [collective bargaining agreement] can one answer whether the [drug testing] program was legitimately implemented"). IV. IV. ___ Conclusion Conclusion __________ We are not without sympathy for Flibotte, who obtained a large verdict many years ago, then was plunged into a longeval legal limbo, and ultimately saw his prized damage award vanish when a new judge came on the scene. It is understandable that Flibotte views the newly arrived judge as the juridical equivalent of the Grinch who stole Christmas, but in actuality, the judge did no more than her duty. As she recognized, the resolution of each of Flibotte's state-law claims requires an  ____________________ 2It bears repeating that an arbitrator has already ruled in PTL's favor on the propriety of Flibotte's discharge, and that an historic reason for section 301's extensive preemptive scope was "to ensure that, when developed, the resultant rules would be applied through the grievance procedures agreed upon between unions and management." Jackson v. Liquid Carbonic Corp., 863 _______ ______________________ F.2d 111, 114 (1st Cir. 1988). This reason remains valid today. 13 examination of the terms of the collective bargaining agreement and, as a result, the claims are preempted under section 301. Because the district court correctly divined and applied the law, we can go no further. Affirmed. Affirmed. ________ 14