Dyne v. Babin                           CV-97-31-SD    11/10/98
                UNITED STATES DISTRICT COURT FOR THE

                     DISTRICT OF NEW HAMPSHIRE


<u>Mikel Dyne</u>

        v.                              Civil No. 97-31-SD

<u>Louis P. Babin, individually
  and in his official capacity as
  Chief of Police for the Littleton
  Police Department;
Kathryn Taylor, individually
  and in her capacity as former
  Littleton Selectperson;
Donald Craigie, individually
  and in his capacity as former
  Littleton Selectperson;
Earl Ellingwood, individually
  and in his capacity as former
  Littleton Selectperson; and
Town of Littleton, New Hampshire</u>


                         O R D E R


        Plaintiff Mikel Dyne, a former member of the Littleton, New

Hampshire, police department, brings this action against the Town

of Littleton (town), its police chief, and three of its former

selectpersons, claiming violations of his civil rights under 42

U.S.C. § 1983 (Counts I, II, and III) and making state law claims

(Counts IV, V, and VI).

        Count I alleges that the defendants violated Dyne's First

Amendment right to free speech by refusing to allow him to speak

out against subordinate officers whom he learned were involved in illegal conduct and by instituting new working conditions in retaliation for having voiced his concerns. The remaining counts are all based upon Dyne's alleged constructive and/or actual discharge. Counts II and III allege a deprivation of substantive and procedural due process in violation of the Fourteenth Amendment. Count IV alleges wrongful termination, Count V is a breach of contract claim, and Count VI alleges intentional interference with contractual relations.

Currently before this court is defendants' motion for summary judgment,[1] to which plaintiff objects.

## Background

Mikel Dyne began his career as a police officer with the Town of Littleton in April 1982 and became a sergeant in April 1991. As a full-time police officer, his tenure was governed by New Hampshire Revised Statutes Annotated (RSA) 41:48, which provides that full-time officers "shall continue to hold such

---

[1]Although the motion and memorandum of law indicate they are from the Town of Littleton only, without reference to the other defendants, the court assumes they were submitted on behalf of all defendants. The motion raises qualified immunity on behalf of the individual defendants; furthermore, Attorney Donald Gardner entered an appearance for all defendants, and the court has not received a change of appearance indicating that the individual defendants have retained new counsel.

office during good behavior, unless sooner removed for cause by the selectmen, after notice and hearing, or unless the town has rescinded its action as provided in 41:47." The terms and conditions of plaintiff's employment were governed by a collective bargaining agreement (CBA) negotiated between the police union and the town and signed in March 1992. The CBA provided that disciplinary action, including discharge, could only be taken for "just cause" and outlined a three-part grievance procedure for disputes "involving the interpretation, application or alleged violation of any provision of this agreement." Defendants' Motion for Summary Judgment, Exhibit E at 6.

Between November 1992 and January 1993, Dyne became aware of two incidents involving Littleton police officers which he believed to be illegal. The first incident involved a gun allegedly taken from the evidence room. Officer Herb Lloyd had told another officer that he was interested in keeping the gun, which was evidence acquired in an investigation in which Lloyd participated. When it was discovered that the gun was missing, Chief Babin told the entire force there would be a major problem if the weapon was not returned. Shortly thereafter, the gun was found in another officer's locker. That officer and Officer Lloyd were polygraphed. The polygraph indicated that the denial

3

by the officer in whose locker the gun was found was more credible than Lloyd's denial.

The second incident occurred just two months later, when Lloyd allegedly ordered a subordinate officer to strip-search a black youth who was not under arrest and had not been officially detained.

After learning of the two incidents, plaintiff met with Chief Babin and recommended that Lloyd be terminated. Chief Babin elected not to discipline anyone. Dyne repeatedly raised this issue with the chief until Dyne left the Littleton police department on January 19, 1994.

During this period, the terms and conditions of plaintiff's employment allegedly changed. Specifically, the police department opted out of a previous commitment it had made to Dyne to help fund a burglary investigation he was conducting; he was required to complete extensive daily log sheets; and he was ordered to attend every session of a violence intervention class for the third grade in the Littleton Elementary School.

On December 22, 1993, Dyne submitted a letter of resignation to Chief Babin to be effective on January 5, 1994. After plaintiff explained to the chief the reasons prompting him to resign, the chief told Dyne that changes would be made. Consequently, Dyne withdrew his letter. When the issues

4

surrounding the misconduct were not addressed, plaintiff resubmitted his letter of resignation on January 12, 1994, to be effective January 19.  On January 14, after hearing a rumor that he was being forced out of the department, Dyne attempted once again to rescind his letter of resignation.  The chief stated that plaintiff's resignation had been accepted by the selectpersons of the town.  Consequently, Dyne left his position on January 19, 1994, and turned in his equipment one day later.  In September 1996, Dyne learned that the Littleton selectpersons had not accepted his resignation in January 1994 as Chief Babin had indicated.

On January 17, 1997, Dyne filed both a Whistleblower's Protection Act, RSA 275-E, complaint with the New Hampshire Department of Labor and a complaint with this court.  On March 3, 1998, the New Hampshire Department of Labor conducted a hearing regarding Dyne's complaint.  After hearing plaintiff's testimony, the hearing officer dismissed the complaint, holding that Dyne failed to avail himself of the grievance procedures available to him through the CBA as required by the Whistleblower's Protection Act.  See Defendants' Memorandum, Exhibit F.

## Discussion

### 1. Summary Judgment Standard

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is a procedure that involves shifting burdens between the moving and nonmoving parties. Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). In determining whether or not summary judgment is appropriate, the court construes the evidence and draws all

6

justifiable inferences in the nonmoving party's favor.[2] See

Anderson, supra, 477 U.S. at 255.


2. Res Judicata

Plaintiff argues that the finding in the WhistleBlower's Protection Act decision that the terms and conditions of Dyne's employment were negatively impacted should be treated as res judicata. Plaintiff's Objection at 8. The doctrine of res judicata prohibits an attempt to relitigate "precisely the same question, particular controversy, or issue, which has been necessarily tried and finally determined" in an earlier litigation. See Hallisey v. Deca Corp., 140 N.H. 443, 444, 667 A.2d 343, 344 (1995). After hearing plaintiff's testimony, the hearing officer dismissed the case because Dyne failed to utilize the grievance procedures available to him. The officer's finding

---

[2]Defendants argue that Dyne's allegations are based upon inadmissible evidence and thus should not be considered by this court. See Defendants' Reply to Plaintiff's Objection at 3. Defendants are correct that courts shall not consider hearsay statements in ruling on a motion for summary judgment, see Stone and Michaud Ins., Inc. v. Bank Five for Sav., 785 F. Supp. 1065, 1071 (D.N.H. 1992); however, Dyne's testimony of out-of-court statements concerning the alleged police misconduct and of conversations he had with Chief Babin and former Town Manager Michael Farrell does not fall into the category of hearsay. His testimony is not offered to prove the truth of those statements, but rather for the nonhearsay purpose of proving that the statements were made. Accordingly, the testimony is not excluded from this court's consideration.

7

that the conditions of Dyne's employment were adversely affected was not necessary to the judgment and thus is not entitled to preclusive effect.  See Monarch Life Ins. Co. v. Ropes & Gray, 68 F.3d 973, 978 (1st Cir. 1995) ("In order to invoke collateral estoppel [defendant] must demonstrate that . . . [the court's] resolution of that issue of law or fact was essential to its judgment (i.e., necessary to its holding).")

### 3.  Statute of Limitations

The limitations period for Counts I, II, and III, personal injury actions brought under section 1983, is governed by the law of the forum state.  See Wilson v. Garcia, 471 U.S. 261, 280 (1985).  The remaining counts are either contract or personal injury actions.  Since the statute of limitations for both personal injury and contract actions in New Hampshire is three years, RSA 508:4, I, each of Dyne's claims must have accrued no more than three years prior to January 17, 1997, the date he filed suit.

In a contract action, the claim accrues when the contract breach occurs, see Bronstein v. GeoEnvironmental, Inc., 140 NH 253, 255, 665 A.2d 369, 371 (1995); in a tort action, the claim accrues when the plaintiff should reasonably know of the damage. See Conrad v. Hazen, 140 NH 249, 252, 665 A.2d 372, 375 (1995).

8

The jurisprudence of section 1983 actions directs courts to examine federal law to determine the accrual period. See Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir. 1995). Under federal law, accrual starts when the plaintiff "knows, or has reason to know, of the injury on which the action is based." Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992). However, a claim alleging a violation that occurs over an extended period is timely so long as some of the challenged acts fall within the statutory period. See Bruno v. Western Electric Co., 829 F.2d 957, 960 (10th Cir. 1987); Goldman v. Sears, Roebuck & Co., 607 F.2d 1014, 1018 (1st Cir. 1979), cert. denied, 445 U.S. 929 (1980). A claim will not be saved, however, if only the consequences of the alleged violation fall within the limitations period. De Leon Otero v. Rubero, 820 F.2d 18,19 (1st Cir. 1987).

Two relevant questions arise. First, when did Dyne know or have reason to know of the injury on which his action is based? Second, if Dyne knew of the injury before January 17, 1994, has he alleged sufficient evidence for a fact finder to conclude that the violations continued to occur, eventually falling within the statutory period? Defendants argue that Dyne knew of his alleged injury by either December 22, 1993, or January 5, 1994, the dates on which he submitted his letters of resignation. Defendants'

Motion for Summary Judgment at 23. Therefore, defendants argue, Dyne's claims are time barred. Dyne rebuts that the injury did not occur until he left the town's employ on January 19, 1994. Plaintiff's Objection at 14.

Thus the dispositive issue is whether his injury occurred prior to or, rather, the actual moment he left the Littleton police department. The United States Supreme Court addressed a similar question in <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 252, 257-58 (1980), a case in which the plaintiff, a professor, was denied tenure in June 1974. The college then offered him a terminal contract that expired one year later, in June 1975. In September 1977, Ricks brought a civil action under 42 U.S.C. § 1981, alleging racial discrimination. Actions brought under section 1981 must be filed within three years of the alleged unfair employment decision. Because the allegedly unlawful act was the denial of tenure, the United States Supreme Court held that the plaintiff's claim accrued in June of 1974, not on the date his employment was terminated. The termination date itself was merely the "inevitable consequence" of prior discrimination and thus did not trigger the statute of limitations. <u>Id</u>. at 258. Because the mere continuation of his employment was insufficient to prolong the life of his cause of action, his claim was time barred.

10

The instant case, however, is distinguishable. The Court in Ricks put great emphasis on the finality of the college's decision to deny the plaintiff tenure. See id. at 262. There was nothing the plaintiff alone could do to prevent his eventual termination from employment. By contrast, Dyne's letters of resignation lacked this definitive quality. He withdrew the first letter when Chief Babin promised that conditions would improve, and he attempted to withdraw the second. Moreover, Dyne avers that until the day he left, he continued to speak with Chief Babin and Town Manager Farrell over the reasons which forced him to leave. See Plaintiff's Objection at 14. A factfinder could conclude that until Dyne actually left his employment on January 19, 1994, he was hopeful that the conditions of his employment would improve. Thus, until he actually left, his constructive discharge was undetermined. Based on this record, Dyne's injury did not occur until January 19, 1994.

Count I alleges that, in retaliation for having exercised his First Amendment right to free speech, defendants instituted new working conditions so difficult that Dyne was forced to resign. Having submitted his first letter of resignation to Chief Babin on December 22, 1993, Dyne must have known of the retaliation against him by that date. The final alleged

11

retaliatory act, however, was the constructive discharge itself. Thus the alleged violation of his First Amendment rights continued to occur, eventually falling within the limitations period. Likewise, Counts II through VI, all based upon Dyne's alleged constructive discharge, are not time barred as a matter of law.

## 4. Qualified Immunity

The individual defendants assert the affirmative defense of qualified immunity from damages as to Dyne's section 1983 claims. Qualified immunity shields government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. Id. at 818, 819.

"To be 'clearly established,' the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Quintero

12

de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "This is not to say that an official action in question has previously been held unlawful, see Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985), but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, supra, 483 U.S. at 640. "If the law was clearly established, the immunity defense should ordinarily fail, since a reasonably competent public official should know the law governing his conduct." Harlow, supra, 457 U.S. at 818-819.

While the merits of Dyne's First and Fourteenth Amendment claims are addressed in sections 4 and 5 below, the relevant questions here are (1) whether the law governing those claims was clearly established at the time the individual defendants allegedly acted and (2) whether a reasonable official would have understood that what he was doing violated that right.

### a.  Chief Babin

Count I alleges a deprivation of Dyne's First Amendment right to free speech.  In Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), the Supreme Court established that adverse action taken by a public employer against an employee motivated by the employee's exercise of constitutionally protected speech

13

is a violation of the First Amendment.  The First Circuit has used a three-pronged test to determine whether the employee's First Amendment right has been violated, focusing on (1) whether the employee was speaking as a citizen upon matters of public concern; (2) whether the employee's right to speak out outweighs the governmental interest in promoting efficient performance of public service; and (3) whether the government would have reached the same decision in the absence of the protected conduct.  See O'Connor v. Steeves, 994 F.2d 905, 912 (1st Cir. 1993).

In light of this court's finding that genuine and material factual issues exist as to whether Chief Babin violated Dyne's First Amendment right to free speech, see section 5, infra, the chief is not entitled to qualified immunity at this summary judgment stage.  The court finds and rules that the law governing Dyne's First Amendment claim was clearly established at the time of Chief Babin's conduct and that a reasonable police chief would not have believed that retaliating against an officer for having voiced his concerns about illegal activity within the department was lawful in light of this clearly established law.

Counts II and III allege a deprivation of substantive and procedural due process.  In support of his claims, Dyne asserts two theories by which his resignation could be found to be involuntary, thus depriving him of his property right to

14

continued employment. First, he claims that in retaliation for having voiced his concerns to the chief, his working conditions became so difficult that he was forced to resign. Thus, Dyne argues, his resignation amounted to a constructive discharge. Second, apparently in the alternative, he claims that the chief's statement that Dyne's resignation had been accepted, thereby preventing Dyne from withdrawing his resignation before its effective date, amounted to an actual discharge.

As a full-time police officer since April 1982, Dyne's tenure was governed by RSA 41:48, which gave him an expectation of continued employment. Thus, at the time Chief Babin allegedly acted, it was clearly established that Dyne had a property interest in his employment. It was also clearly established that a state actor cannot constitutionally deprive an employee of a property interest without due process. See Board of Regents v. Roth, 408 U.S. 564, 576 (1972); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985). This court finds and rules that the law governing Dyne's Fourteenth Amendment substantive and procedural due process claims was clearly established at the time of his alleged constructive discharge and that a reasonable police chief would not believe that instituting new working conditions so difficult or unpleasant that they amounted to a constructive discharge was lawful. Thus Chief Babin is not

15

entitled to qualified immunity with respect to Dyne's constructive discharge claim.

Chief Babin is immune, however, from Dyne's claim of actual discharge. The First Circuit has not concluded that a misrepresentation by an employer or its agent concerning the right of an employee to withdraw his or her letter of resignation may amount to an actual discharge. Moreover, while the chief's statement may have turned out to be untrue, there is no evidence suggesting that the chief acted in bad faith or knew his statement was false at the time he made it. <u>See</u> Plaintiff's Objection at 10. Thus, even had the law been clearly established, the chief could not have reasonably known that his statement violated a constitutionally protected right.

### d. Town Selectpersons

The town selectpersons named as defendants in this action are immune from plaintiff's section 1983 claims. With respect to his First Amendment claim, Dyne has not presented evidence that former selectpersons Taylor, Craigie, and Ellingwood were aware of the retaliatory acts taken against him. With respect to his Fourteenth Amendment claims, Dyne does not allege that the selectpersons knew his resignation was the result of a constructive discharge and thus was without just cause. They

16

also could not have believed that the mere act of accepting Dyne's resignation deprived him of his constitutional rights. Thus defendants Taylor, Craigie, and Ellingwood, having no knowledge of the alleged constitutional violations, are entitled to qualified immunity.

5.  First Amendment

Count I alleges that the defendants violated plaintiff's First Amendment right to free speech by refusing to allow him to speak out against subordinate officers who he learned were involved in illegal conduct and by instituting new working conditions in retaliation for having voiced his concerns. Dyne has not presented support for the theory that Chief Babin, as his superior officer, was obligated to institute his recommendations that the officers involved in the alleged illegal conduct be disciplined or dismissed. The record clearly indicates that Chief Babin did not prevent Dyne from voicing his concerns. Defendant's Memorandum, Exhibit D at 123-125. Thus plaintiff's claim that the chief violated his First Amendment right to free speech by refusing to allow him to speak out against the officers is without merit.

Plaintiff's second theory, however, raises a number of compelling questions. The First Circuit uses a three-pronged

17

test to determine whether a public employee has an actionable claim for the infringement of his or her First Amendment rights. See O'Connor, supra, 994 F.2d at 912. First, the court must determine whether the employee was speaking "as a citizen upon matters of public concern" or, alternatively, "as an employee upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147-48 (1983). In O'Connor, the plaintiff, a former superintendent of public works, was discharged following a feud with the town selectmen. O'Connor brought suit against the town and three selectmen for violating his First Amendment right to free speech by discharging him for having revealed misconduct by an incumbent elected official. The court found that the plaintiff's revelations directly implicated a topic of inherent concern to the community. See O'Connor, supra, 994 F.2d at 915; see also Brasslet v. Cota, 761 F.2d 827, 844 n.14 (1st Cir. 1985) (fire chief's public commentary on available fire protection and on town council's actions in dealing with associated problems plainly qualified as matters of inherent "public concern"). Like the plaintiff in O'Connor, Dyne's discussion with Chief Babin regarding the alleged illegal and unethical conduct of fellow police officers, including tampering with evidence and ordering a strip-search of a black youth who had not been arrested or

18

officially detained, constituted a matter of legitimate public concern.

Second, the court must "balance the strength of the employee's First Amendment interest and any public parallel interest in the information which the employee sought to impart, against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its employees." O'Connor, supra, 994 F.2d at 912 (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)). The court in O'Connor found a strong public interest in the plaintiff's disclosures of a public official's alleged abuse of office, thus heavily weighting the scale in favor of First Amendment protection against retaliation for the plaintiff's speech. O'Connor, supra, 994 F.2d at 916. Although the court addressed abuses by an elected official, alleged abuses by appointed police officers are sufficiently analogous to weigh the scale in favor of Dyne's First Amendment protection. Moreover, in the instant action, the town has not presented evidence supporting its legitimate interest as employer in curtailing the specific disclosures which plaintiff alleges were the basis for his constructive discharge. Viewing the record in the light most favorable to plaintiff, this court cannot conclude that the town's interest in suppressing Dyne's speech

outweighed the importance of the legitimate public interest in his discussions with the police chief concerning the alleged police misconduct.

Third, the public employee "must show that the protected expression was a substantial or motivating factor in the adverse employment decision; and, if the plaintiff meets this test, the defendant governmental entity must be afforded an opportunity to show 'by a preponderance of the evidence that [it] would have reached the same decision . . . even in the absence of the protected conduct.'" O'Connor, supra, 994 F.2d at 913 (quoting Mt. Healthy, supra, 429 U.S. at 287). The town argues that, even if this court finds that plaintiff's resignation was involuntary, there is no evidence that his speech was a substantial or motivating factor in his discharge. Thus, defendant argues, plaintiff's First Amendment claim is without merit. In response, Dyne alleges that the terms and conditions of his employment became intolerable only after he continued to urge the chief to address the alleged misconduct and discipline the officers involved. It is indeed notable that, after Dyne had worked as a full-time Littleton police officer and/or sergeant for more than ten years, the conditions of his employment allegedly began to change shortly after he voiced his concerns about police misconduct to Chief Babin. See Mesnick v. General Elec. Co., 950

20

F.2d 816, 828 (1st Cir. 1991) ("temporal proximity of an employee's protected activity to an employer's adverse action" may be circumstantial evidence of retaliation allowing plaintiff to survive summary judgment). Dyne's supported allegations are sufficient to create a genuine and material factual issue as to whether the chief's actions were motivated by a desire to retaliate against him for exercising his First Amendment rights. Moreover, the town has not presented evidence that Chief Babin would have acted the same way had Dyne not constantly voiced his concerns.

For the abovementioned reasons, this court finds that Dyne has alleged sufficient evidence for a reasonable jury to find that the defendants violated his First Amendment right to free speech.

6. Fourteenth Amendment

Dyne claims that he was deprived of his "liberty and/or property interest" in continued employment by defendants acting under color of state law, thus by state action, without due process of law. See Complaint at 12. To claim entitlement to the protections of the due process clause, a plaintiff must show that he has been deprived of a constitutionally protected liberty or property interest by some form of state action. See Daniels

21

v. Williams, 474 U.S. 327, 331 (1986). Otherwise, the constitutional right to due process is not implicated.

### a. Liberty Interest

Plaintiff alleges that defendants' conduct deprived him of a liberty interest. To state such a claim, Dyne would have to allege facts tending to show that defendants made charges against him that "might seriously damage his standing and associations in his community" or otherwise "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Roth, supra, 408 U.S. at 573-75. There is nothing in the record to support such a finding.

### b. Property Interest

It is undisputed that, as a full-time police officer, Dyne had a property interest in continued employment. See RSA §41:48. The more difficult question is whether he was deprived of that interest. Although courts have typically addressed actual Fourteenth Amendment deprivations, constructive deprivations have been recognized as well. See Reed v. Village of Shorewood, 704 F.2d 943, 949 (7th Cir. 1983). If, as Dyne indicates, his resignation was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the substantive and procedural

22

components of the due process clause.  See Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 172 (4th Cir. 1988). If, as the town contends, Dyne voluntarily resigned, then he surrendered his property interest in continued employment and thus has no substantive nor procedural rights.  The critical question for this court is whether plaintiff has alleged sufficient evidence for a reasonable jury to find that he was constructively discharged, thus making his resignation involuntary.

As stated above, Dyne asserts two theories by which the resignation he tendered to Chief Babin could be found to be involuntary.  Because the individual defendants are entitled to qualified immunity with respect to plaintiff's claim of actual discharge, this court confines its inquiry to the constructive discharge claim.

### c.   Constructive Discharge

"'Through the use of constructive discharge, the law recognizes that an employee's "voluntary" resignation may be, in reality, a dismissal by the employer.'"  Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1186 (D.N.H. 1992) (quoting Seery v. Yale-New Haven Hospital, 554 A.2d 757, 761 (Conn. App. Ct. 1989) (citation omitted)).  To establish a claim for constructive

23

discharge, the evidence must support a finding that "the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995); see Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977)). The legal standard to be applied is "objective," with the inquiry focused on "the reasonable state of mind of the putative discriminatee." Calhoun, supra, 798 F. 2d at 561. Consequently, an employee may not be unreasonably sensitive to his or her working environment. See id.

A plaintiff can legitimately be said to feel compelled to resign under a number of scenarios. A constructive discharge may occur when an employee's resignation resulted from new working conditions that were particularly humiliating or demeaning; for example, by exposing him or her to ridicule in front of clients. See Greenberg, supra, 48 F.3d at 27 (citing Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992)). Likewise, a demotion or reduction in pay are also relevant considerations. See id. (citing Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888-89 (3d Cir. 1984)). The First Circuit has also recognized that direct or circumstantial evidence of discriminatory animus can

24

substantiate the intolerable nature of one's working conditions. See id. at 28 (citing Acrey v. American Sheep Indus., 981 F.2d 1569, 1574-5 (10th Cir. 1992)).

Defendants contend that no reasonable person could find that Dyne was constructively discharged. In support of this contention, defendants state that "Chief Babin never prevented the plaintiff from voicing his concerns." Defendants' Motion for Summary Judgment at 13. However, even assuming that statement to be true, the more pertinent question is whether sufficient evidence exists to support a finding that Dyne's working conditions became so difficult or unpleasant that he was forced to resign. In support of his claim, plaintiff alleges that the police department opted out of a commitment it had made to help fund a major investigation he was conducting in another town; that he was required to complete extensive daily log sheets, although previous prosecutors had not been asked to do this; and that, against his wishes, the chief ordered Dyne to attend every session of a violence intervention program for a third grade class at Littleton Elementary School. Viewed alone and out of context, these working conditions do not appear to be so difficult or unpleasant that a reasonable person would feel compelled to resign. See Bristow v. Daily Press, Inc., 770 F.2d 1251, 1254-56 (4th Cir. 1985) (no constructive discharge where

25

conditions, though unpleasant, are part and parcel to the job), cert. denied, 475 U.S. 1082 (1986). The claim is strengthened, however, when this evidence is viewed in relation to the conversations Dyne constantly had with the chief, in which Dyne objected to the chief's refusal to address the alleged illegal conduct by fellow police officers.

In cases brought under federal anti-discrimination statutes, courts considering constructive discharge claims have looked at whether the adverse action was taken in retaliation for a protected act. See, e.g., Hart v. University Sys. Of New Hampshire, 938 F. Supp. 104, 107 (D.N.H. 1996). In these cases, the fact that the complained-of actions were motivated by discriminatory or retaliatory animus makes the actions intolerable where they otherwise might not be. See Greenburg, supra, 48 F.3d at 28 ("[E]vidence of a discriminatory animus could help substantiate a claim that one's working conditions had become intolerable . . . ."). For example, in Hart, supra, 938 F. Supp. at 107, this court found it significant to plaintiff's constructive discharge claim that the employer's request for the plaintiff's resignation and his reduction of her pay and hours followed shortly after the plaintiff had complained to her employer about gender discrimination. Likewise, viewing the evidence in the light most favorable to Dyne, it is

26

significant that Chief Babin instituted new working conditions only after Dyne objected to the chief's refusal to address the discipline problem in the department. This court cannot say as a matter of law that the evidence presented, taken as a whole, is insufficient to support a finding of constructive discharge.

Defendants argue that Dyne's failure to explore the option of filing a grievance precludes a finding of constructive discharge. In another recent case, the court held that "a reasonable person will usually explore . . . alternative avenues thoroughly before coming to the conclusion that resignation is the only option." Larkin v. Town of West Hartford, 891 F. Supp. 719, 729 (D. Conn. 1995) (citing Boze v. Branstetter, 912 F.2d 801, 805 (5th Cir. 1990)). The court included filing a grievance and "threatening to quit if changes are not made" as acceptable alternatives one could explore prior to resignation. See id. Although Dyne did not file a formal grievance, he claims he constantly spoke with the chief regarding his concerns about illegal conduct in the department and withdrew his first letter of resignation after the chief allegedly told him that changes would be made. This court cannot say that Dyne failed to explore alternative avenues before concluding that resignation was his only option.

Lastly, defendants claim that Dyne did not resign within a reasonable time following the second of the two alleged incidents which occurred in January 1993. Defendants argue that the one-year time period between the last incident and plaintiff's resignation is too great to support a claim of constructive discharge. See Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991). In that case, the court ruled for the employer because the last alleged discriminatory act occurred six months before the plaintiff resigned. Id. at 167. Here, the alleged strip search that defendants claim occurred too long before plaintiff resigned is not the challenged violation. Rather, Dyne is challenging the change in his working conditions that occurred after he reported the two illegal incidents to the chief. Much of this impact allegedly lasted until Dyne actually left the department. Thus Dyne filed his claim with this court in a timely manner.

For the abovementioned reasons, this court finds that plaintiff has alleged sufficient evidence for a reasonable jury to conclude that he was constructively discharged.

7.  Pendant State Law Claims

    a.  Wrongful Discharge

    Count IV alleges that the town discharged Dyne out of bad faith, malice, or retaliation, and that, by attempting to curb the illegal conduct of fellow police officers, Dyne was performing acts which public policy would encourage.  Thus, Dyne argues, his termination was wrongful.

    Under the governing law of New Hampshire, employees fall into two classes: contract employees and at-will employees.  See Censullo v. Brenka Video, Inc., 989 F.2d 40, 42 (1st. Cir. 1993) (citing Panto v. Moore Business Forms, Inc., 130 N.H. 730, 739, 547 A.2d 260, 267 (1988)).  An employer's termination of an at-will employee motivated by bad faith or malice or based on retaliation is not in the "interest of the economic system or the public good and constitutes a breach of the employment contract." Monge v. Beebe Rubber Co., 114 N.H. 130, 133, 316 A.2d 549, 552 (1974).  This rule affords the employee a certain stability of employment and does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably.  See id. Only at-will employees, however, may avail themselves of this cause of action.  Employees with contractual rights to continued

29

employment are limited in their remedies for breach by the terms of the contract. See Censullo, supra, 989 F. 2d at 42.

In this case, it is undisputed that Dyne was a contract employee. Article X of the CBA governing Dyne's employment provided that disciplinary action including discharge could only be taken for "just cause." Defendant's Memorandum, Exhibit E at 6. Because the CBA includes this discharge provision, the public policy exception to the employment at will doctrine does not apply; as a contract employee, Dyne is limited in his remedy for breach by the terms of the contract.

### b. Breach of Contract

In Count V, Dyne contends that the town breached its contract by discharging plaintiff without cause and without providing him notice and a hearing as required by RSA 41:48. However, while this statute vests full-time police officers with a property right to continued employment, and thus the protections of due process, it does not double as a bargained -for exchange between two parties that can be breached. Rather, the CBA between the Littleton police and the town is the only contract governing the terms and conditions of Dyne's employment. Dyne's claim for breach of contract therefore must arise from the CBA. Defendants request summary judgment on this claim based on

the plaintiff's failure to avail himself of the grievance and arbitration procedures provided in the collective bargaining agreement.

Courts normally apply federal labor law to interpret a collective bargaining agreement. See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399 (1988); Filbotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997). "[S]ection 301 [of the Labor Management Relations Act, 29 U.S.C. § 185] preempts a state-law claim, whether founded upon the state's positive or common law, if a court, in passing upon the claim, would be required to interpret the collective bargaining agreement." Filbotte, supra, 131 F.3d at 26. Thus, it appears that the contract claim should be interpreted with reference to the federal law. The defendants, however, have not raised the preemption issue. In fairness to the plaintiff, the court will not decide the issue without giving him opportunity to address the question of whether the applicable law is state contract law or federal labor law. The defendants' motion for summary judgment is therefore denied. If defendants' wish to renew their motion on this count, they may do so, but should address the preemption issue.

c.  Interference with Contractual Relations

Count VI alleges that Chief Babin improperly interfered with Dyne's economic relationship with the town.  The chief argues that Count VI fails to state a claim upon which relief can be granted because, as an agent of the town acting within the scope of his employment, he cannot be a third party with respect to the economic relationship.  See Defendants' Motion For Summary Judgment at 21.

Section 301 preemption appears to be relevant to this claim, but again has not been addressed by the parties.  In Magerer v. John Sexton & Co., 912 F.2d 525, 530-31 (1st Cir. 1990), the court held that an intentional interference with contractual relations claim was preempted by section 301 because its resolution depended upon the interpretation of a collective bargaining agreement.  That case, however, was based on Massachusetts tort law.  Arguably this holding is not applicable to the instant claim premised upon New Hampshire law.  The court will deny the motion for summary judgment as resolution of this claim requires discussion of the section 301 preemption issue, which has yet to be addressed.

## Conclusion

For the abovementioned reasons, defendants' motion for summary judgment is granted in part (Count IV) and denied in part (Counts I, II, III, V, and VI).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

November 10, 1998

cc:  Edward M. Van Dorn, Jr., Esq.
      Donald E. Gardner, Esq.