# United States Court of Appeals
## For the First Circuit

No. 15-1198

CATHERINE RUELI, et al.,

Plaintiffs, Appellants,

v.

BAYSTATE HEALTH, INC., and BAYSTATE VISITING NURSE ASSOCIATION & HOSPICE, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Howard, Chief Judge, and
Lynch and Lipez, Circuit Judges.

Shannon Liss-Riordan, with whom Lichten & Liss-Riordan, P.C. was on brief, for appellants.
Robert Morsilli, with whom Douglas J. Hoffman and Jackson Lewis P.C. were on brief, for appellees.

August 23, 2016

**LIPEZ**, <u>Circuit Judge</u>. Plaintiffs are a putative class of unionized nurses who sued their employer in state court for unpaid wages and overtime pay for work performed outside their approved shifts. Their employer removed the case to federal court, citing the doctrine of complete preemption, under which claims requiring interpretation of a collective bargaining agreement ("CBA") are reclassified as federal claims. The district court, finding that this case is controlled by our opinion in <u>Cavallaro</u> v. <u>UMass Memorial Healthcare, Inc.</u>, 678 F.3d 1, 3-4 (1st Cir. 2012), determined that complete preemption applies and therefore denied plaintiffs' motion to remand. Separately, it granted the defendants' motion for judgment on the pleadings. Plaintiffs appeal, challenging both orders.

We must decide whether there is a plausible argument, as defendants contend, that adjudicating plaintiffs' claims will require the resolution of a genuine interpretive dispute about one or more provisions of the CBA. If so, the putative state law claims are completely preempted, and removal was proper. Separately, we must determine whether the plaintiffs, in agreeing to a CBA containing a grievance and arbitration provision, were precluded from bringing this suit, requiring the district court to grant judgment on the pleadings to defendants.

We affirm.

**I.**

Catherine Rueli and seven other named plaintiffs are employed by defendants-appellees Baystate Visiting Nurse Association & Hospice, Inc. and Baystate Health, Inc. ("Baystate"). Plaintiffs are visiting nurses, i.e., nurses responsible for traveling to patients' homes to provide care. As members of a union, the Massachusetts Nurses Association, plaintiffs concede that they are subject to the terms of a CBA between that union and Baystate. The agreement's provisions include:

- A preamble stating that "[i]t is the intent and purpose of this Agreement to promote orderly collective bargaining and the settlement of all differences or disputes through the grievance and arbitration procedures established herein."

- A salary schedule based on seniority, CBA § 3.1, App'x A, separate pay provisions for per diem nurses, id. art. XXXV(5)-(6), and a separate "per visit" compensation scheme, id. art. XXXVI.

- A number of provisions for premium pay, including time-and-a-half pay for hours worked beyond the standard 37 1/2-hour work week, id. § 4.2, pay for on-call time, id. §§ 4.4(B), 5.3, 6.3(A), 31.1(3), and evening differential pay, id. §§ 4.7(E), 4.8(D), 5.4.

- A scheduling provision requiring that "[a] definite reporting time, working schedule and staffing schedule . . . shall be established by [Baystate]," and that "schedules shall not be changed without prior discussion between both parties." Id. § 4.1(B).

- 3 -

- A requirement that "[a]ll patient documentation shall be completed at the point of care or prior to the end of the employee[']s shift. Any variations from either of these requirements are subject to the employee's request and approval of the clinical manager which shall not be unreasonably withheld. To assist the manager in making her/his reasonable determination, a conversation shall take place in which the employee's and patient[']s needs will be discussed." Id. § 4.1(C).

- A management rights clause, giving Baystate management "the recognized reserved right" "to schedule and assign work to employees; to determine the means, methods, processes, materials and schedules of operations; . . . to establish standards and to maintain the efficiency of employees; [and] to establish and require employees to observe [Baystate's] rules and regulations." Id. § 16.1.

- A grievance and arbitration provision allowing that "[g]rievances may be filed by a nurse, a group of nurses, the Unit Representative or Massachusetts Nurses Association." The provision requires that grievances first be submitted to an immediate supervisor, then, if not resolved, escalated to the President of Baystate, and, if still not resolved, grievances "shall be submitted to arbitration in accordance with the voluntary rules of the American Arbitration Association. The decision of the Arbitrator shall be final and binding upon the employees[.]" Id. The term "grievances" is not defined in the agreement.

Plaintiffs brought suit in Hampden County Superior Court, claiming that the volume of work required them to work before and after their scheduled shifts and they were not paid for that time. In seeking wages owed and other relief under the Weekly Wage Act, Mass. Gen. Laws ch. 149, § 148, and the Overtime Act, Mass. Gen. Laws ch. 151, § 1B, they sue for themselves and on

behalf of a broad putative class: "all others similarly situated, namely all other individuals who are, and who have been, employed as nurses by Defendants who have not received all wages and overtime payments due to them." Compl. ¶ 10.

Plaintiffs alleged the following facts in their complaint, which we accept as true:

- "In their employment with Baystate, visiting nurses such as the named plaintiffs have been paid an hourly wage (ranging from approximately $28 to $38 per hour)." Id. at ¶ 13.[1]

- "Due to the volume of work assigned to them, the nurses are regularly required to work outside of their regularly scheduled shifts." Id. at ¶ 15.

- "This unpaid work has included preparatory work before they have visited a patient and follow-up work after they have visited a patient." Id. at ¶ 16.

- "As a result, the nurses often do not receive overtime payments to which they are entitled." Id. at ¶ 17.

- "This unpaid work frequently consists of computer work in preparation for a visit with a patient, and computer work following up after a visit. Thus, much of this unpaid work is completed by the nurses while they are logged onto the Baystate computer system. Defendants are therefore aware of the work performed by the nurses outside of their regularly scheduled shifts for which they are not compensated." Id. at ¶ 18.

---

[1] At the time of the complaint the minimum wage was eight dollars per hour, H.B. 4781, Gen. Ct., 2006 2d Ann. Sess., 2006 Mass. Legis. Serv. Ch. 271, while today it stands at ten dollars per hour, Mass. Gen. Laws Ann. ch. 151, § 1.

- 5 -

Plaintiffs do not allege that any of the nurses informed Baystate about this additional unpaid work, or that they followed the grievance procedure laid out in the CBA.

Baystate removed this action to the United States District Court for the District of Massachusetts, arguing that these state statutory claims are "completely preempted" by § 301 of the Labor Management Relations Act ("LMRA"). See Livadas v. Bradshaw, 512 U.S. 107, 121-25 (1994); 29 U.S.C. § 185(a). Plaintiffs moved to remand the case to state court. Before that motion was decided, Baystate moved for judgment on the pleadings, arguing that "[i]f a claim is preempted, and plaintiffs have not pursued those claims through the grievance procedure under the relevant CBA, the claims are not only subject to removal, but also dismissal." Agreeing that the claims are completely preempted, the district court denied plaintiffs' motion to remand, holding that our opinion in Cavallaro controlled and that plaintiffs' claims are completely preempted by § 301. Rueli v. Baystate Health Inc., No. 3:14-cv-10319-MGM, 2015 WL 132662, at *2-*3 (D. Mass. Jan. 9, 2015). Believing that its finding of complete preemption required dismissal of the case, the district court then granted Baystate's motion for judgment on the pleadings. Rueli v. Baystate Health Inc., No. 3:14-cv-10319-MGM, slip. op. at 2-3 (D. Mass. Jan. 30, 2015). Plaintiffs challenge both orders, arguing that Cavallaro does not control and complete preemption does not apply.

- 6 -

**A. Complete preemption**

We outline complete preemption doctrine as it developed in the context of § 301 of the LMRA.[2]

**1. Creating federal jurisdiction**

"Complete preemption" is distinct from "[o]rdinary, or defensive, preemption." Cavallaro, 678 F.3d at 4 n.3.  It "applies where a purported state claim . . . is re-characterized as a federal claim" such that it is said to arise under federal law and permit removal to federal court.  Id. at 4; see also 28 U.S.C. §§ 1331, 1441.  As one of our sister circuits has characterized the concept, "'[c]omplete preemption' is a misleadingly named doctrine."  Hughes v. United Air Lines, Inc., 634 F.3d 391, 393 (7th Cir. 2011).  "Preemption normally is a defense . . . .  But 'complete preemption' is not a defense.  It means that the claim itself arises under federal law" for purposes of the well-pleaded complaint rule.  Id.

Section 301 of the LMRA, enacted in 1947, creates federal subject matter jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization

_____

[2] Though other federal statutes completely preempt state laws, see Metro. Life Ins. Co. v. Taylor, 481 U.S. 58 (1987) (Employee Retirement Income Security Act); Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 11 (2003) (National Bank Act), we deal here only with the doctrine as it applies to the LMRA.

representing employees." 29 U.S.C. § 185(a). The Supreme Court later held that § 301 is "more than jurisdictional --[] it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 450-51 (1957). "[T]he subject matter of § 301(a) 'is peculiarly one that calls for uniform law.'" Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962) (quoting Pa. R.R. Co. v. Pub. Serv. Comm'n, 250 U.S. 566, 569 (1919)).

It was against this background that the Supreme Court held that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization. Any such suit is purely a creature of federal law . . . ." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 23 (1983) (internal quotation marks omitted) (footnote omitted) (interpreting the holding of Avco Corp. v. Machinists, 390 U.S. 557, 560 (1968)). Although "state courts have concurrent jurisdiction over controversies involving collective-bargaining agreements," United Steelworkers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 368 (1990), defendants may choose to remove such cases to federal court.

The Supreme Court has expanded the doctrine beyond its original scope, holding that "the pre-emptive effect of § 301 must

extend beyond suits alleging contract violations," in order to prevent plaintiffs from "evad[ing] the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract," i.e., to prevent them from avoiding complete preemption through artful pleading. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210-11 (1985). Lueck marked the beginning of a gradual expansion of complete preemption to any state law claims that satisfy one of two tests: the claims must either be "founded directly on rights created by collective-bargaining agreements" or "substantially dependent on analysis of a collective-bargaining agreement." Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987).

We focus on the latter test for complete preemption, which we have described as whether "resolution" of a claim "arguably hinges upon an interpretation of the collective bargaining agreement." Flibotte v. Penn. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997); see also BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 832 (1st Cir. 1997).[3] The qualifier "arguably" is necessary because,

---

[3] "Interpretation" of the CBA must be distinguished from mere "consultation." "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted" does not trigger complete preemption. Livadas, 512 U.S. at 124. This principle applies where "[a] collective-bargaining agreement . . . contain[s] information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is

- 9 -

at the outset of a case when defendants remove to federal court, "we cannot know the exact contours of the wage dispute and the precise CBA terms likely to require interpretation cannot be certain." Cavallaro, 678 F.3d at 8. This "arguably" test focuses on "the legal character of a claim," not its underlying facts. Livadas, 512 U.S. at 123. "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 409-10 (1988).

District courts need not conduct this analysis for every putative state law claim. Where plaintiffs bring multiple state-law claims based on the "same nucleus of operative facts," the court need only determine whether one of them is completely preempted and, therefore, removable. BIW Deceived, 132 F.3d at 833 (citing 28 U.S.C. § 1367(a)). If so, the others may also be removed -- even if they are not completely preempted, they will be

---

entitled." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 413 n.12 (1988). Hence, "[c]ourts confronted with state law claims must . . . locate the line between the need for mere consultation of [the] CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims." Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 10 (1st Cir. 1999).

subject to supplemental jurisdiction in federal court. Id.; Cavallaro, 678 F.3d at 5.

## 2. Disposition of completely preempted claims

"When one turns from removal of the case to disposition of the claims, a different set of issues arise." Cavallaro, 678 F.3d at 6. Where complete preemption applies, the CBA must be interpreted under the "evolving federal common law grounded in national labor policy," Bowen v. U.S. Postal Serv., 459 U.S. 212, 225 (1983), rather than state contract law. This promotes "interpretive uniformity and predictability," which are thought to promote the orderly resolution of labor disputes. Lueck, 471 U.S. at 211. In particular, "federal common-law rules of decision . . . assure that agreements to arbitrate grievances w[ill] be enforced, regardless of the vagaries of state law and lingering hostility toward extrajudicial dispute resolution." Livadas, 512 U.S. at 122.

The relevant CBA invariably includes an arbitration clause, see Lingle, 486 U.S. at 411 n.11 (recognizing that "[a]rbitrators are delegated by nearly all [CBAs] as the adjudicators of contract disputes"), and, under the federal common law applicable under § 301, there is a heavy presumption that claims requiring interpretation of the CBA are arbitrable.

> [W]hen a collective bargaining agreement contains an arbitration clause . . . "a presumption of arbitrability [is created] in

- 11 -

the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."

Local 285, Serv. Emps. Int'l Union v. Nonotuck Res. Assocs., 64 F.3d 735, 738 (1st Cir. 1995) (alterations in original) (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)); see also Otis Elevator Co. v. Int'l Union of Elevator Constructors, Local 4, 408 F.3d 1, 7 (1st Cir. 2005) (highlighting the "fundamental principle of industrial relations in the United States that labor disputes are settled through voluntary arbitration rather than labor/management strife").  In most cases, a claim that requires interpretation of the applicable CBA is covered by "a broadly-phrased grievance and arbitration provision in the CBA," and such claims are dismissed "so long as relief can be provided within the CBA process."  Cavallaro, 678 F.3d at 6; see also Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 114 (1st Cir. 1988) ("[C]laims . . . preempted by section 301 [are] relegated, in the first instance, to the grievance procedures available under the [CBA].").[4]

_____

    [4] This standard does not necessarily apply to interpretation of an arbitration provision to determine whether it covers federal statutory claims.  See Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 745 (1981) (holding that Fair Labor Standards Act claims may be brought in federal court notwithstanding an arbitration provision in a CBA); Alexander v. Gardner-Denver Co.,

## B. Massachusetts wage claims

We need only determine whether one of the claims is completely preempted, given that they are based on the same facts. See Cavallaro, 678 F.3d at 5; BIW Deceived, 132 F.3d at 833; 28 U.S.C. § 1367(a). We focus on the Weekly Wage Act claim. The Act requires that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him" within a fixed time period after the work is performed. Mass. Gen. Laws ch. 149, § 148.

The Act "was intended and designed to protect wage earners from the long-term detention of wages by unscrupulous employers." Melia v. Zenhire, Inc., 967 N.E.2d 580, 587 (Mass. 2012) (quoting Cumpata v. Blue Cross Blue Shield of Mass., Inc., 113 F. Supp. 2d 164, 167 (D. Mass. 2000)). Consistent with its purpose to remedy the withholding of wages indisputably owed, the Act allows private plaintiffs to sue for treble damages, attorneys' fees, and costs, and allows the Attorney General of Massachusetts to seek criminal penalties. Mass. Gen. Laws ch. 149, § 148.

To prevail on a Weekly Wage Act claim, a plaintiff must "prove there are wages owed," though the Act itself provides no substantive standard for determining what wages are owed.

_____

415 U.S. 36, 59-60 (1974) (holding that workers may bring Title VII discrimination claims in federal court notwithstanding an arbitration provision in a CBA).

Cavallaro, 678 F.3d at 8. Consistent with its name, the Weekly Wage Act was intended to ensure that employers pay wages weekly or bi-weekly, not to create substantive standards for employee pay. See Lipsitt v. Plaud, 994 N.E.2d 777, 784-85 (Mass. 2013) (characterizing the Weekly Wage Act as a supplement to common law causes of action for breach of contract and quasi-contract to recover unpaid wages, with no mention of any role for the Act in creating substantive standards for wages).

The Supreme Judicial Court of Massachusetts has emphasized the importance of the Weekly Wage Act to the public policy of the state. Melia, 967 N.E.2d at 588 (stating that the Act "protect[s] fundamental public policy," and that "the Legislature has highlighted the fundamental importance of the Wage Act"). Accordingly, the court has held that the protections of the Weekly Wage Act cannot be waived by workers. Id.; see Mass. Gen. Laws ch. 149, § 148 ("No person shall by a special contract with an employee or by any other means exempt himself from this section . . . .").[5] The Act does not "guarantee venue in a Massachusetts court," however, and if an employee enters a binding agreement with a forum selection clause, she must bring her Weekly

---

[5] In Cavallaro, we assumed but did not decide that the statutory rights created by the Weekly Wage Act were non-waivable. 678 F.3d at 7. Because Cavallaro predated Melia, we did not then have the benefit of the Massachusetts Supreme Judicial Court's holding that the rights created by the Wage Act cannot be waived. See Melia, 967 N.E.2d at 588.

Wage Act claim in the agreed-upon forum. Melia, 967 N.E.2d at 588-89; see also Dixon v. Perry & Slesnick, P.C., 914 N.E.2d 97, 99-100 (Mass. App. Ct. 2009) ("[C]laims under the Wage Act are arbitrable."). The exception is where that forum would apply law that "would effectively deprive the employee of substantive rights guaranteed by the Wage Act." Melia, 967 N.E.2d at 589. "A forum selection clause that, in operation, would deprive an employee of substantive rights guaranteed by the Wage Act violates public policy and is unenforceable." Id. at 590.

## C. **Cavallaro**

Much of the dispute between the parties focuses on Cavallaro. In Cavallaro, as here, plaintiffs were unionized nurses suing their employers for back pay, including for hours worked before and after their scheduled shifts. Specifically, plaintiffs alleged that they had "been deprived of compensation for work performed during their meal break, for work performed before and after shifts, and for time spent attending training sessions." Cavallaro, 678 F.3d at 2. They brought thirteen Massachusetts state law claims, including a claim under the Weekly Wage Act. Cavallaro, 678 F.3d at 3.[6]

---

[6] Plaintiffs also brought a claim under the Overtime Act, Mass. Gen. Laws ch. 151, § 1A, which we referred to in Cavallaro as the Massachusetts Fair Minimum Wage Act. Cavallaro, 678 F.3d at 9. Because the district court had properly dismissed the Overtime Act claim on the ground that the statute does not apply to employees who work "in a hospital," Mass. Gen. Laws ch. 151,

- 15 -

We noted that "to succeed" on a Weekly Wage Act claim, "an employee must, among other things, prove there are wages owed." Id. at 8.  We treated the question of whether wages were owed as incorporating the question of whether the CBA provided for wages that had not been paid.  And, because the CBA provisions governing whether the plaintiffs had performed compensable work were ambiguous enough to plausibly give rise to an interpretive dispute, we held that "determining what (if anything) is owed -- an inevitable issue here -- depends at least arguably on interpretations and applications of the CBA at issue."  Thus the claim was completely preempted.  Id.

We explained which provisions of the CBA plausibly would require interpretation.  For example, adjudicating whether plaintiffs were entitled to wages for training time would likely require interpretation of the CBA provision specifying that "whether certain training programs are compensable depends on the employee having made a 'timely' request to attend."  Id.  Similarly, whether wages were owed for meal time would likely require interpretation of the CBA provision stating that whether

_____

§ 1A(16), we did not reach the question of whether adjudication of that claim would require interpretation of the CBA.  Id.  The parties agree that the hospital employee exception does not apply to the visiting nurses in this case.

that time was compensable "depends upon whether a nurse remained in the 'patient care area.'"  Id.[7]

### III.

We review de novo both the denial of the motion to remand, which is a question of federal subject matter jurisdiction, see BIW Deceived, 132 F.3d at 830, and the grant of judgment on the pleadings as a matter of law, see Flibotte, 131 F.3d at 25.

### A. Removal

The question before us is whether resolving one of the claims would require a court to interpret the CBA.  As stated above, we focus on the Weekly Wage Act claim.  See BIW Deceived, 132 F.3d at 833; Cavallaro, 678 F.3d at 5; 28 U.S.C. § 1367(a).

---

[7] We also said in Cavallaro that "any claim for compensation above the state minima must be entirely dependent on the CBA." 678 F.3d at 8.  Baystate argues that this statement amounts to a holding that a claim for unpaid wages determined according to a wage schedule in a CBA, higher than the state minimum wage, is necessarily a claim to vindicate rights created by the CBA, an independent ground on which we must find complete preemption. See Caterpillar, 482 U.S. at 394.  Plaintiffs respond that this reading of Cavallaro would run afoul of Livadas and Lingle, which in plaintiffs' view establish that suing for damages based on payment formulas in a CBA does not necessarily trigger complete preemption. See Lingle, 486 U.S. at 413 n.12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled.  Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand."); Livadas, 512 U.S. at 124 (quoting same passage from Lingle).  Because we hold that plaintiffs' Weekly Wage Act claim is completely preempted on other grounds, we need not resolve the disputed meaning of this statement in Cavallaro.

Plaintiffs emphasize that they do not rely on any provisions of the CBA to establish their claim. To be sure, as plaintiffs acknowledge, no wages are owed under the CBA for hours worked outside scheduled shifts without approval. Such approval is available based on either "prior discussion between both parties," CBA § 4.1(B), or, in the case of additional time to complete patient documentation, "approval of the clinical manager which shall not be unreasonably withheld," id. § 4.1(C). However, plaintiffs argue, these requirements are not at issue because under the Weekly Wage Act, wages are owed for all work the employer "suffers or permits" to be done, regardless of whether it would be compensable under the CBA.

Plaintiffs articulate the "suffered or permitted" standard as whether Baystate "knew or should have known they were working time outside of their shifts[] and did not pay them for their time." This formulation mirrors the standard for determining if overtime pay is owed under the state Overtime Act and the federal Fair Labor Standards Act. See Vitali v. Reit Mgmt. & Research, LLC, 36 N.E.3d 64, 68-70 (Mass. App. Ct. 2015); Raposo v. Garelick Farms, LLC, 293 F.R.D. 52, 56 (D. Mass. 2013); Prime Commc'ns, Inc. v. Sylvester, 615 N.E.2d 600, 602 (Mass. App. Ct.

1993).  Baystate accepts this formulation, and we therefore apply the "suffered or permitted" standard.[8]

With that background, we must consider whether plaintiffs' Weekly Wage Act claim plausibly would require interpretation of the CBA.  We conclude that it would.  We acknowledge that actual knowledge is a matter of pure fact.  Hence, if plaintiffs were able to vindicate their claims with proof of Baystate's actual knowledge of their unpaid hours, they could show that Baystate "suffered or permitted" them to work those hours without the need to interpret the CBA.  However, plaintiffs' complaint does not allege a basis for actual knowledge of all of the unpaid hours worked by the nurses.

The only particularized allegation suggesting actual knowledge is that Baystate knew of all the hours worked on its computer system.  Compl. ¶ 18 ("[M]uch of this unpaid work is completed by the nurses while they are logged onto the Baystate computer system.  Defendants are therefore aware of the work performed by the nurses outside of their regularly scheduled shifts for which they are not compensated.").  In plaintiff's favor, we

---

[8] The Appeals Court of Massachusetts has expressly held that this "suffered or permitted" standard for compensable work applies in both FLSA and Overtime Act cases.  Vitali, 36 N.E.3d at 68-69; see also Mullaly v. Waste Mgmt. of Mass., Inc., 895 N.E.2d 1277, 1281 (Mass. 2008) ("[The Overtime Act] was 'intended to be essentially identical' to the Fair Labor Standards Act[.]").  However, the Massachusetts appellate courts have not as yet made any such holding with regard to the Weekly Wage Act.

assume arguendo that actual knowledge without more would suffice to show sufferance or permission. Yet even accepting the further assumption that plaintiffs could show Baystate's actual knowledge of every hour worked on the computers, plaintiffs do not limit their claims to those hours. They assert only that "much of this unpaid work" would be reflected on the computer logs. Id. (emphasis added).

Moreover, the work at issue was apparently performed by the visiting nurses off-site, including at patients' homes, away from the immediate gaze of their superiors. We think it unlikely that plaintiffs can prove actual knowledge of those hours to Baystate solely on the basis of the computer logs. Cf. Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 44 (1st Cir. 2013) (finding the allegation that an employer had actual or constructive knowledge under the FLSA of nurses' unpaid hours sufficient to survive a motion to dismiss, where "the employees' uncompensated work was performed on defendants' premises during operational hours, and in full view of defendants' managers and supervisors"). We thus think it is not only plausible, but likely, that plaintiffs will need to rely on constructive knowledge for some, if not all, of the hours at issue.

In other words, resolution of this dispute will likely involve a determination of whether Baystate should have known about the nurses' unpaid work. Unlike actual knowledge, this issue must

be considered "in view of the employer's 'duty . . . to inquire into the conditions prevailing in his business.'" Vitali, 36 N.E.3d at 69 (alteration in original) (quoting Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 512 (5th Cir. 1969)). The constructive knowledge inquiry is not limited to facts -- it is intertwined with an analysis of the employer's duty to inquire into what workers are doing, and what reasonable diligence the employer must perform to ensure that unauthorized hours are not being worked. This inquiry into Baystate's obligations can be expected to require interpretation of the CBA.

For example, determining whether Baystate was required to look beyond the nurses' time sheets might depend on whether it was entitled to rely on the provisions specifying that work hours cannot be changed without Baystate's permission, CBA §§ 4.1(B)-(C), and the management rights clause giving Baystate the right to create workplace rules and set schedules, id. § 16.1. See also Martin v. Shaw's Supermarkets, Inc., 105 F.3d 40, 43-44 (1st Cir. 1997) (holding that plaintiff's claim would require interpretation of the management rights clause of the CBA, and was therefore preempted); Fant v. New Eng. Power Serv. Co., 239 F.3d 8, 16 (1st Cir. 2001) (citing the management rights clause of the CBA in support of its holding that plaintiff's claims were completely preempted). Baystate reasonably could argue that, because of those provisions, any duty to inquire into employee hours is limited

when no request for permission to work additional hours has been made.

The CBA, however, reflects the possibility that the permission requirement does not apply to every "extra" hour worked. The agreement provides that "[a]ll patient documentation shall be completed at the point of care or prior to the end of the employee[']s shift." CBA § 4.1(C) (emphasis added). Although the meaning of this provision is not clear, it arguably contemplates occasions when nurses will need to work overtime to complete patient documentation "at the point of care" -- albeit after "the end of the employee[']s shift" -- when the demands of patient care do not leave time for paperwork during the shift. That is to say, it is plausible that determining the impact of the permission requirement -- and, more broadly, determining Baystate's constructive knowledge -- will require interpreting CBA § 4.1(C) in combination with the permission and management rights provisions. Cf. Kobold v. Good Samaritan Reg'l Med. Ctr., Nos. 13-33528, 13-35590, 13-35265, 2016 WL 4191521, at *6 (9th Cir. Aug. 9, 2016) (holding a plaintiff's state-law wage claims completely preempted because a CBA provision providing for overtime "except when there is a change of schedule agreed upon by the Medical Center and nurse" would need to be interpreted).

Resisting this conclusion, plaintiffs' brief warns us that a finding of complete preemption would amount to a finding

that "union employees have fewer rights under state wage laws than non-union employees," a result that "would effectively penalize workers for being union members." This outcome would, plaintiffs suggest, contravene the Supreme Court's statement in Livadas that § 301 "cannot be read broadly to preempt nonnegotiable rights conferred on individual employees as a matter of state law." 512 U.S. at 123-24; see also Lueck, 471 U.S. at 212 ("[I]t would be inconsistent with congressional intent under [§ 301] to preempt state rules that . . . establish rights and obligations, independent of a labor contract."); Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 751 (1985) (noting that the LMRA was not intended "to prevent the States from establishing minimum employment standards that labor and management would otherwise have been required to negotiate").

Here, however, Baystate has not argued that plaintiffs have waived the substantive rights granted to them by Massachusetts wage statutes. To the contrary, it takes the position that the nurses' claims may be pursued through the agreed-to grievance and arbitration procedure, which permits grievances to be filed by a nurse or a group of nurses. In its motion for judgment on the pleadings, Baystate argued that plaintiffs should have first brought their claims through the grievance and arbitration procedure, emphasizing the intent of the CBA to channel all disputes into that process. In Baystate's words, "the relief

sought by Plaintiffs in this case <u>was</u> available to them under the CBA's grievance procedure."  In its brief on appeal, Baystate again argues that the relief sought by plaintiffs was available via the agreed-to dispute resolution mechanism.

In <u>Cavallaro</u>, we expressly declined to decide whether the completely preempted Weekly Wage Act claim could be brought via the CBA grievance process.  678 F.3d at 8; <u>see</u> <u>also</u> <u>Livadas</u>, 512 U.S. at 124 n.18.  We need not decide this question here. Baystate's statements make clear that it interprets the CBA to allow plaintiffs to pursue the remedy they seek in arbitration, and that plaintiffs may rely on that interpretation when bringing their claims, such that "relief" for violations of the state wage statutes "can be provided within the CBA process." <u>Cavallaro</u>, 678 F.3d at 6.

Because the Weekly Wage Act claim is completely preempted, the entire action was removable to federal court and the motion to remand was properly denied.

**B. Judgment on the pleadings**

Plaintiffs, in their opposition to the motion for judgment on the pleadings, omitted any discussion of the grievance and arbitration provision in the CBA, effectively waiving any argument that it did not apply to their claims. <u>See</u> <u>Grenier</u> v. <u>Cyanamid Plastics, Inc.</u>, 70 F.3d 667, 678 (1st Cir. 1995). Similarly, on appeal, plaintiffs omit any argument that their

- 24 -

claims are not covered by the grievance and arbitration requirement of the CBA.

Under the federal common law applicable to completely preempted claims, claims are typically found to be arbitrable where the grievance and arbitration provision is "broadly-phrased" and "relief can be provided within the CBA process." Cavallaro, 678 F.3d at 6; see also Local 285, Serv. Emps. Int'l Union, 64 F.3d at 738. The mandatory grievance and arbitration provision at issue here covers all "grievances." Absent any argument to the contrary, we have no trouble determining that the provision is broad enough to encompass plaintiffs' claims.

Hence, the CBA required the nurses to raise their wage claims through the grievance procedure in the first instance. The court properly entered judgment on the pleadings and dismissed plaintiffs' claims.

Affirmed.